**CASE NO. 22-10360**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**OTIS CRANDEL, AS DEPENDENT ADMINISTRATOR OF, AND ON BEHALF OF, BILLY WAYNE WORL, JR., EMILY GARCIA, JAMES MATTHEW GARCIA, AND JARED ANDREW GARCIA, INDIVIDUALLY, THE ESTATE OF BRENDA KAYE WORL, AND BRENDA KAYE WORL'S HEIRS-AT-LAW; AND BILLY WAYNE WORL, JR., INDIVIDUALLY,**

*Plaintiffs – Appellants,*

**v.**

**DALENA HALL AND CARI RENEA MCGOWEN,**

*Defendants – Appellees.*

---

**On Appeal from the United States District Court
Northern District of Texas, Abilene Division
Civil Action No. 1:21-CV-75**

---

**BRIEF OF APPELLEES DALENA HALL AND CARI RENEA MCGOWEN**

---

**GRANT D. BLAIES**
**State Bar No. 00783669**
**Email: grantblaies@bhilaw.com**
**JENNIFER HOLLAND LITKE**
**State Bar No. 24002481**
**Email: jlitke@bhilaw.com**
**BLAIES & HIGHTOWER, L.L.P.**
**420 Throckmorton St., Suite 1200**
**Fort Worth, Texas 76102**

**817-334-0800 (Telephone)**
**817-334-0574 (Facsimile)**

**ATTORNEYS FOR APPELLEES**
**DALENA HALL AND**
**CARI RENEA MCGOWEN**

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| | | |
|---|---|---|
| 1. | Appellant | Otis Crandel, as dependent administrator of, and on behalf of Billy Wayne Worl, Jr., Emily Garcia, James Matthew Garcia, and Jared Andrew Garcia, individually, the Estate of Brenda Kaye Worl, and Brenda Kaye Worl's heirs-at-law; Billy Wayne Worl, Jr., Individually |
| 2. | Counsel for Appellants | Bruce K. Thomas<br>LAW OFFICE OF BRUCE K. THOMAS<br>12900 Preston Road, Suite 590<br>Dallas, Texas  75230<br>Phone/Fax:  214.296.9650<br>Email:  bthomas@bthomaslaw.com<br><br>T. Dean Malone<br>LAW OFFICES OF DEAN MALONE, P.C.<br>900 Jackson Street, Suite 730<br>Dallas, Texas  75202<br>Telephone:  214.670.9989<br>Facsimile:  214.670.9904<br>Email:  dean@deanmalone.com |
| 3. | Appellee | Dalena Hall |
| 4. | Appellee | Cari McGowen |

5.  Counsel for Appellees

Grant D. Blaies
Jennifer Holland Litke
BLAIES & HIGHTOWER, L.L.P.
420 Throckmorton Street, Suite 1200
Fort Worth, Texas 76102

 /s/ Grant David Blaies

GRANT D. BLAIES
State Bar No. 00783669
Email:  grantblaies@bhilaw.com

JENNIFER HOLLAND LITKE
State Bar No. 24002481
Email:  jlitke@bhilaw.com

BLAIES & HIGHTOWER, L.L.P.
420 Throckmorton Street, Suite 1200
Fort Worth, Texas 76102
817-334-0800 (Telephone)
817-334-0574 (Facsimile)

ATTORNEYS FOR APPELLEES
DALENA HALL AND
CARI RENEA MCGOWEN

## STATEMENT REGARDING ORAL ARGUMENT

Appellees believe this case involves the application of well-established legal principals and that oral argument is not needed to assist the Court in evaluating the record and legal issues presented thereby. But if the Court is inclined to grant Appellants' request for oral argument, then Appellees wish to present oral argument as well.

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ........................................... iii

TABLE OF CONTENTS....................................................................................iv

TABLE OF AUTHORITIES ...............................................................................v

STATEMENT OF JURISDICTION........................................................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE..............................................................................2

      A.    Course of Proceedings and Disposition Below ....................................2

      B.    Statement of the Facts ..........................................................................2

SUMMARY OF THE ARGUMENT .....................................................................7

ARGUMENT .....................................................................................................8

I.    ISSUE NO. 1: THE DISTRICT COURT DID NOT ERR
    IN GRANTING APPELLEES' SUMMARY JUDGMENT .........................8

      A.    Applicable Standard of Review..............................................................8

      B.    Qualified Immunity Requirements.........................................................9

      C.    Appellees Are Entitled to Qualified Immunity
          Because There Was No Clear Violation of a
          Constitutional Right ...........................................................................11

              1. The *Kingsley* Standard Does
                 Not Apply in This Case ................................................11

# TABLE OF CONTENTS (cont'd.)

**Page(s)**

2.  Appellees Did Not Act with
    Deliberate Indifference to
    Worl's Rights ...................................................................13

D.  The District Court's Summary Judgment Can Also
    Be Affirmed on the Grounds that the Existing Law
    Did Not Prevent the Actions of Appellees ..........................44

E.  The District Court Properly Granted Summary
    Judgment in Favor of Appellees on Appellants'
    Bystander Liability Claim ...................................................47

II.  ISSUE 2: THE DISTRICT COURT DID NOT ERR
     IN SUSTAINING APPELLEES' OBJECTIONS TO
     APPELLANTS' SUMMARY JUDGMENT EVIDENCE ..........................49

A.  Applicable Standard of Review...........................................49

B.  The District Court Properly Ruled as to
    Appellants' Evidence ..........................................................49

CONCLUSION ...................................................................................50

CERTIFICATE OF SERVICE .................................................................52

CERTIFICATE OF COMPLIANCE ..........................................................53

# TABLE OF AUTHORITIES

## CASES:                                                                 Page(s)

*Alderson v. Concordia Par. Corr. Facility,*
    848 F.3d 415 (5th Cir. 2017) ..................................................12-13

*Anderson v. Creighton*, 483 U.S. 635 (1987)...................................9, 11

*Baker v. McCollan*, 443 U.S. 137 (1979)............................................11

*Banks v. Gammon*, NO. 3:08-cv-0474-K-BH,
    2010 U.S. Dist. LEXIS 70565 (N.D. Tex.
    June 10, 2010) .....................................................................10-11

*Belcher v. Oliver*, 898 F.2d 32 (4th Cir. 1990) ....................................17

*Bernabe v. Rosenbaum*, No. 4:18-cv-00580-O,
    2021 U.S. Dist. LEXIS 50706 (N.D. Tex.
    Mar. 18, 2021).......................................................................... 29

*Branton v. City of Moss Point*, 261 Fed. App'x 659
    (5th Cir. 2008) ......................................................................18,19

*Carnaby v. City of Houston*, 636 F.3d 183 (5th Cir. 2011)................ 8, 9

*Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98
    893 F.2d 98 (5th Cir.), *cert. denied*,
    498 U.S. 817 (1990) .................................................................... 8

*Castro v. County of Los Angeles*, 833 F.3d 1060,
    (9th Cir. 2016) ........................................................................... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................... 8

*Chipley v. Yazoo City*, No. 3:16-cv-901-TSL-RHW,
    2018 U.S. Dist. LEXIS 66639 (S.D. Miss.
    Apr. 20, 2018) ........................................................................... 25

*Connelly v. Comptroller*, 876 F.2d 1209 (5th Cir. 1989)...................... 10

# TABLE OF AUTHORITIES (cont'd.)

**CASES:**                                                                    **Page(s)**

*Constitution State Ins. Co. v. Iso-Tex., Inc.*,
    61 F.3d 405 (5th Cir. 1995).......................................................................... 8

*Converse v. City of Kemah*, 961 F.3d 771 (5th Cir. 2020)...............................36-39

*Cooper v. City of La Porte Police Dep't*,
    608 Fed. App'x 195 (5th Cir. 2015)............................................................. 49

*Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021)
    *cert. denied*, 142 S. Ct. 2573
    (2022) ............................................ 12, 14, 15, 29-30, 31, 39, 40, 41, 45, 46

*Curtis v. Peterson*, No. 5:20-cv-264-BQ,
    2021 U.S. Dist. LEXIS 136719 (N.D. Tex.
    May 28, 2021) ............................................................................................. 48

*Danese v. Asman*, 875 F.2d 1239 (6th Cir. 1989),
    *cert. denied*, 494 U.S. 1027 (1990) ........................................................... 28

*Darden v. City of Fort Worth*, 880 F.3d 722
    (5th Cir. 2018) ....................................................................................... 42, 43

*Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752
    (5th Cir. 2001) ............................................................................................. 14

*Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020) .................................................... 38

*Estate of Bonilla v. Orange County*, 982 F.3d 298
    (5th Cir. 2020) ...............................................................12, 13, 16, 17, 46

*Estate of Pollard v. Hood County*, No. 4:12-cv-163-Y,
    2013 U.S. Dist. LEXIS 191877 (N.D. Tex.
    Mar. 14, 2013)............................................................................................. 26

# TABLE OF AUTHORITIES (cont'd.)

**CASES:**                                                                **Page(s)**

*Evans v. City of Dallas*, No. 3:16-cv-0561-L,
    2017 U.S. Dist. LEXIS 35222 (N.D. Tex.
    Mar. 13, 2017)............................................................................ 14

*Farmer v. Brennan*, 511 U.S. 825 (1994) ..................................... 26, 38

*Gonzales v. Hill*, No. 4:16-CV-291-A, 2016 U.S. Dist.
    LEXIS 92656 (N.D. Tex. July 15, 2016)................................... 10

*Guiterrez v. City of San Antonio*, 139 F.3d 441
    (5th Cir. 1998) ...................................................................... 42, 43

*Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996)
    (en banc)...................................................................................... 46

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ......................................... 9

*Jacobs v. West Feliciana Sheriff's Dep't*,
    228 F.3d 388 (5th Cir. 2000)................................................. 38, 39

*Johnston v. City of Westworth Village*, No. 4:17-cv-279-A,
    2017 U.S. Dist. LEXIS 104980 (N.D. Tex.
    July 7, 2017)........................................................................ 14, 17

*Keller v. Coastal Bend College*, 629 Fed. App'x 596
    (5th Cir. 2015) .......................................................................... 49

*Keller v. Fleming*, 952 F.3d 216 (5th Cir. 2020)............................. 44, 45

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)........................ 11-12, 13

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)......................... 8

*Lombardo v. City of St. Louis*, 141 S. Ct. 2239 (2021) ............ 41, 42, 43

# TABLE OF AUTHORITIES (cont'd.)

**CASES:**                                                                    **Page(s)**

*Lytle v. Bexar County Texas*, 560 F.3d 404 (5th Cir. 2009),
    *cert. denied*, 559 U.S. 1007 (2010) ............................................................ 10

*Mason v. Lafayette City-Parish Consul. Gov't.*,
    806 F.3d 268 (5th Cir. 2000) ......................................................................... 29

*Moore v. LaSalle Corrections, Inc.*, No. 3:16-cv-01007,
    2020 U.S. Dist. LEXIS 203193 (W.D. La.
    Oct. 30, 2020) ....................................................................................... 15, 17

*Morgan v. Swanson*, 659 F.3d 359 (5th Cir. 2011),
    *cert. denied*, 567 U.S. 905 (2012) ..........................................................45-46

*Nunez v. Deviney*, No. 4:06-cv-0579-BE,
    2007 U.S. Dist. LEXIS 51683 (N.D. Tex.
    July 17, 2007) ..................................................................14, 18, 19-20, 25

*Nuss v. City of Seven Points*, No. 3:18-cv-02192-X,
    2020 U.S. Dist. LEXIS 197040 (N.D. Tex.
    Oct. 1, 2020) ............................................................................................. 21

*Pasco v. Knoblauch*, 566 F.3d 572 (5th Cir. 2009) ............................................... 10

*Posey v. Southwestern Bell Tel. L.P.*, 430 F. Supp. 2d 616,
    (N.D. Tex. 2006) ................................................................................... 18, 30

*Rankin v. Wichita Falls*, 762 F.2d 444 (5th Cir. 1985) ......................................... 11

*Reyes v. Hale County Jail*, No. 5:03-cv-180 C,
    2003 U.S. Dist. LEXIS 28535 (N.D. Tex.
    Sept. 16, 2003) ........................................................................................28-29

*Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992) ............................ 13, 26

*Riggins v. City of Indianola*, 196 F. Supp. 3d 681
    (N.D. Miss 2016) ......................................................................................... 18

# TABLE OF AUTHORITIES (cont'd.)

**CASES:**                                                          **Page(s)**

*Scott v. Harris*, 550 U.S. 372 (2007) ................................................. 8, 10

*Siegert v. Gilley*, 500 U.S. 226 (1991) ................................................ 10

*Thompson v. Upshur County*, 245 F.3d 447
    (5th Cir. 2001) ........................................................................ 38, 39

*Timpa v. Dillard*, 20 F.4th 1020 (5th Cir. 2021) ....................................... 41, 42, 43

*Timpa v. Dillard*, No. 3:16-CV-3089-N, 2020 U.S. Dist.
    LEXIS 118365 (N.D. Tex. July 6, 2020)
    (*aff'd in part and rev'd in part on other grounds*,
    20 F. 4th 1020 (2021)) ............................................................... 48

*Ybarra-Fuentes v. City of Rosenberg*, No. H-18-1824,
    2018 U.S. Dist. LEXIS 195690 (S.D. Tex.
    Nov. 16, 2018) ............................................................ 25, 26, 27, 28, 46

**CODES:**

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

28 U.S.C. § 1343 ......................................................................... 1

37 T.A.C. 275.1 ......................................................................... 27, 36

## STATEMENT OF JURISDICTION

Appellants appeal from a Final Judgment dismissing Appellants' claims from the United States District Court for the Northern District of Texas, Abilene Division, the Honorable Sam R. Cummings presiding. The district court had subject matter jurisdiction over Appellants' claims pursuant to 28 U.S.C. §§ 1331 and 1343, as Appellants asserted claims under 42 U.S.C. § 1983 for alleged violations of Brenda Worl's Fourteenth Amendment rights.

On April 11, 2022, Appellants filed a timely notice of appeal of the Judgment entered on March 14, 2022, which was a final order disposing of all claims against Appellees. ROA.3370, 3357.[1] This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

ISSUE NO. 1: The district court did not err in granting Appellees' summary judgment on all claims.

ISSUE NO. 2: The district court did not err in sustaining Appellees' objections to Appellants' summary judgment evidence.

---

[1] Appellants have also appealed a separate order and final judgment dismissing their claims against City of Clyde Police Department Officers Vegas Hastings and Daniel Piper. That Case is docketed in this Court as Case No. 22-10361. This brief will address only the claims against Appellees.

## STATEMENT OF THE CASE

**A.     Course of Proceedings and Disposition Below**

Appellants are Otis Crandel, as dependent administrator of, and on behalf of Billy Wayne Worl, Jr., Emily Garcia, James Matthew Garcia, and Jared Andrew Garcia, individually, the Estate of Brenda Kaye Worl, and Brenda Kaye Worl's heirs-at-law; and Billy Wayne Worl, Jr., individually.  They filed their Complaint on March 17, 2021, against Callahan County, Texas, Dalena Hall, Cari Renea McGowen, The City of Clyde, Vegas Hastings, and Daniel Piper.  ROA.15-102. Appellants asserted claims under 42 U.S.C. § 1983, alleging Appellees violated Brenda Worl's rights under the Fourteenth Amendment.  ROA.91-92.

On August 9, 2021, Appellees filed a Motion for Summary Judgment and Brief in Support Thereof.  ROA 353-392.  On March 14, 2022, the district court granted Appellees' Motion and issued an order dismissing Appellants' Section 1983 claims.  ROA.3349-3357.  Appellants filed their notice of appeal as to the Judgment pursuant to Rule 54(b) on April 11, 2022.  ROA.3370-3372.

**B.     Statement of the Facts**

On April 2, 2019, Appellee Callahan County Sheriff' Office Dispatch Jailer Dalena Hall ("Hall") answered a 911 domestic disturbance call from Brenda Worl ("Worl").  ROA.399.  Worl stated her husband, Billy Worl, was abusing her. ROA.399.  At 22:15 (10:15 p.m.), Hall dispatched Clyde Police Department Officers

Vegas Hastings and Daniel Piper to Worl's residence.  ROA.399.  Officers arrived

on scene at 22:28 (10:28 p.m.).  ROA.399.  The Clyde Police Department Officers

arrested Worl for Class C misdemeanor assault.  ROA.399.  Both Brenda and Billy

Worl were highly intoxicated, but she was the only one arrested.[2]  ROA.399, 449,

453.  At 22:51 (10:51 p.m.) officers advised dispatch they had taken Worl into

custody and were transporting her to the jail.  ROA.399.

Officers Hastings and Piper arrived at the Callahan County Jail with Worl at

23:09 (11:09 p.m.) and brought her inside for booking.  ROA.399, 403, 418.

Appellee Callahan County Sheriff's Office Dispatcher Jailer Renea McGowen

("McGowen") was on duty at the jail, along with Hall.  ROA.418.  After their arrival

at the jail, while Officer Hastings was preparing to take Worl back to the booking

area, Worl advised Hastings she had been able to free one hand from the handcuffs.

ROA.418.  McGowen asked Officer Hastings if she could remove the cuffs because

they could be used as a weapon.  ROA.418.  He agreed and continued to escort Worl

to the booking area.  ROA.418.  McGowen then returned to the dispatch office to

---

[2] As seen on the body camera recordings of the officers, they considered arresting both Brenda and Billy Worl but were informed that the Callahan County Jail was full that night so it would be best if they only arrested one person.  ROA.445.  [Ex. 1-2 to Ex. D (COC00017) at 22:35:24; Ex. 1-3 to Ex. D (COC00018) at 22:38:58 – 22:39:15; Ex. 1-8 to Ex. D (COC00023) at 22:35:21].  All citations to the jail video footage or body camera footage will include citations to the timestamp on the video for specific portions of the videos on which Appellees rely.

finish times on cad/call sheets previously made by Hall, and Hall remained with Worl to book her in to the jail.  ROA.418, 399.

As Hall attempted to initiate the book-in process, Worl became combative and uncooperative.  ROA.399.  As part of the book-in process, Hall attempted to obtain answers from Worl to various questions on both a Medical Information Form and a Screening Form for Suicide and Medical/Mental/Developmental Impairments.  ROA.399, 412, 413, 418.  McGowen overheard Worl raising her voice to Hall, so she walked back to the booking area to see if Hall needed assistance.  ROA.399, 418.  Hall advised that Worl was refusing to allow her to book her into the jail or answer any questions, and she was being verbally disruptive and uncooperative.  ROA.418.  Consequently, before they were able to complete booking, McGowen placed Worl in a visitation room to allow Worl a chance to calm down and to give them an opportunity to clear out a jail cell so they would have a place to house her.  ROA.399-400, 418-419.  McGowen placed Worl in the visitation room because the jail was full that night and there was no holding cell or open cell available, and the jailers needed to move other inmates so they would ultimately have an empty cell in which to place Worl.  ROA.399, 418.  McGowen performed a pat search before placing her in the visitation room and took her shoes, coat and a loose eye glass lens that she had on her person so Worl could not use those items as devices to hurt herself or others.  ROA.418.  McGowen also asked Worl if she had ever

attempted suicide.  ROA.418-419, 449-450.  In response, Worl presented her arms

to McGowen in an apparent attempt to show a lack of scars or other marks that would

indicate a prior suicide attempt, and she stated, "I don't know, have I?"  ROA. 419,

449-450.  McGowen did not observe any injuries, scars or markings on Worl's wrists

or arms.  ROA.419.  McGowen placed Worl in the visitation room at 23:33 hours

(11:33 p.m.), twenty-four minutes after she arrived at the jail.[3]  ROA.399-400, 419,

439.

 Twelve minutes later, at approximately 23:45 (11:45 p.m.), Hall checked on

Worl and observed her sitting on the stool with no issues.[4]  ROA.400, 439.  Only

two minutes later, at approximately 23:47 (11:47 p.m.), McGowen checked on Worl.

ROA.400, 419.  Because she could not visibly observe Worl's body, only the top of

her head as Worl appeared to be sitting on the floor, McGowen went back to the

dispatch office to retrieve the visitation room key.  ROA.419.  McGowen then

returned to the visitation room, opened the door, and discovered Worl sitting on the

---

[3] McGowen can be seen on the jail video at timestamp 14:58:21 when she was on her way back to the dispatch office after she had placed Worl in the visitation room.  ROA.419, 435 [Ex. 2-4 to Ex. C at 14:58:21].

[4] Hall can be seen on the jail video at timestamp 15:07:26 when she was on her way to do this, and she is pictured at timestamp 15:07:35 on the video when she was on her way back to the dispatch office afterwards.  ROA.400, 435 [Ex. 2-5 to Ex. C at 15:07:26, 15:07:35].

floor with her head facing down.[5]  ROA.419.  McGowen lifted Worl's head and discovered a phone cord wrapped around her neck.  ROA.419.  Worl had been at the Callahan County Jail for only approximately 38 minutes and in the visitation room for only approximately 14 minutes when McGowen checked on her and discovered that she had attempted suicide.  ROA. 399-400, 418-419.

Upon finding Worl, McGowen immediately called to Officer Hastings to have dispatch contact emergency medical services ("EMS") as she unwrapped the cord from Worl's neck.  ROA.419.  McGowen then moved her out from the visitation room.  ROA.419.  Officer Hastings advised dispatch, and Hall paged EMS at 23:48 (11:48 p.m.) and called the Callahan County Sheriff at 23:52 (11:52 p.m.) to advise him of the situation.  ROA. 400, 422.  Officer Hastings then initiated CPR along with Officer Piper until EMS arrived at 12:00 a.m.  ROA.419.  EMS was able to obtain a pulse and transported Worl to Hendrick Medical Center at 12:10 a.m.  ROA.400, 419.  Worl was maintained on life support and pronounced brain dead the following day.  ROA.419.

---

[5] McGowen can be seen on the jail video at timestamp 15:12:30 when she was on her way to the visitation room to check on Worl, and then at 15:12:52 on the video when she was returning to the dispatch office to retrieve the visitation room key, and again at 15:13:20 on the video when she was returning to unlock the visitation room.  ROA.435 [Ex. 2-5 to Ex. C].

# SUMMARY OF THE ARGUMENT

Appellees are entitled to qualified immunity because their actions did not rise to the level of deliberate indifference. Worl was belligerent, drunk and uncooperative, but at no time during the brief time she was at the jail did she appear to be a suicide risk. McGowen placed her in a room – the only room available – solely in an effort to calm her down so that they could then complete the book-in process. There was no indication she would take her own life. They checked on her. This happened very quickly with no apparent warnings. Appellees did not violate Worl's Fourteenth Amendment rights. The court can also affirm the granting of Appellees' summary judgment because the existing law as of the date of Worl's death did not so clearly and unambiguously prohibit Appellees' conduct such that *every* reasonable official would understand their actions violated the law. Therefore, summary judgment was also appropriate based on the clearly established law element of the qualified immunity analysis. Summary judgment was also proper as to the bystander liability claims. The elements of this cause of action are not met here, nor did Appellants raise a fact issue on any element of this claim.

## ARGUMENT

**I.    ISSUE NO. 1:  THE DISTRICT COURT DID NOT ERR IN GRANTING APPELLEES' SUMMARY JUDGMENT**

### A.    Applicable Standard of Review

This Court reviews *de novo* a summary judgment based on qualified immunity. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5ᵗʰ Cir. 2011).   Summary judgment is proper if the pleadings and discovery on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5ᵗʰ Cir. 1994); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)) ("'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'") (emphasis in original).

Summary judgment is also appropriate when the only questions to be decided in the case are issues of law.  *Constitution State Ins. Co. v. Iso-Tex., Inc.,* 61 F.3d 405, 407 (5ᵗʰ Cir. 1995); *Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98, 102-103 (5ᵗʰ Cir.), *cert. denied*, 498 U.S. 817 (1990).  The court reviews the "evidence in the light most favorable to the nonmoving party, but conclusional allegations and unsubstantiated assertions may not be relied on as evidence by the nonmoving

party." *Carnaby*, 636 F.3d at 187 (citing *Little*, 37 F.3d at 1075). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 (holding that a videotape of a police chase discredited the plaintiff's version of events and the Court of Appeals should have viewed the facts in the light depicted by the videotape); *Carnaby*, 636 F.3d at 187 ("we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene") (citing *Scott*, 550 U.S. 372).

### B.    Qualified Immunity Requirements

Qualified immunity insulates government officials from civil damage liability when the official's actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A legal right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Individual liability thus turns on the objective legal reasonableness of the defendant's actions assessed in light of the clearly established law at the time. *Id.* at 639.

Whether an individual defendant is entitled to qualified immunity requires a court to engage in a two-part analysis: first it must determine if the plaintiff has alleged a violation of a constitutional right. *Lytle v. Bexar County Texas*, 560 F.3d 404, 409-10 (5th Cir. 2009), *cert. denied*, 559 U.S. 1007 (2010). If the court determines no constitutional violation occurred, that ends the analysis and dismissal is proper. *See id*; *see also Scott v. Harris*, 550 U.S. 372, 386 (2007). If the court finds a constitutional violation, it must then determine whether the right was clearly established at the time of the conduct.[6] *Lytle*, 560 F.3d at 410.

The court should not assume a plaintiff has stated a claim by simply asserting a violation of a constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Rather, the court must be certain that, if the facts alleged by the plaintiff are true, a violation clearly occurred. *Connelly v. Comptroller*, 876 F.2d 1209, 1212 (5th Cir. 1989). When a defendant asserts qualified immunity, the plaintiffs have the burden to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc), *cert. denied*, 537 U.S. 1232 (2003); *Gonzales v. Hill*, No. 4:16-CV-291-A, 2016 U.S. Dist. LEXIS 92656, *9 (N.D. Tex. July 15, 2016); *Banks v. Gammon*, No. 3:08-CV-0474-K-BH, 2010 U.S. Dist.

---

[6] The court is not required to consider these two elements of qualified immunity, a violation of a constitutional right and whether that right was clearly established at the time of the alleged conduct, in that order. *Pasco v. Knoblauch*, 566 F.3d 572, 579 (5th Cir. 2009).

LEXIS 70565, *9 (N.D. Tex. June 10, 2010) (citing *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009)).

Qualified immunity does not require strict constitutional compliance; it only requires reasonable objectivity, and Appellees are protected from liability even if they acted erroneously, yet reasonably. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Further, "Section 1983 imposes liability for violations of rights protected by the Constitution, not violations of duties of care arising out of tort law." *Baker v. McCollan*, 443 U.S. 137, 146 (1979); *Rankin v. Wichita Falls*, 762 F.2d 444, 448 (5th Cir. 1985).

In this case, Appellants cannot establish a Fourteenth Amendment violation. Appellants' claims, therefore, do not overcome Appellees' entitlement to qualified immunity,[7] and the district court properly granted summary judgment.

### C. Appellees Are Entitled to Qualified Immunity Because There Was No Clear Violation of a Constitutional Right

#### 1. The *Kingsley* Standard Does Not Apply in This Case

As an initial matter, Appellants argue the Court should adopt and apply the objective unreasonableness standard set forth in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) in determining whether Appellees violated Worl's Fourteenth

---

[7] This Court should summarily reject Appellants' argument that qualified immunity should not apply to Appellees. Appellants' position is not the current standard and under this Court's precedent, qualified immunity is clearly available in this case.

Amendment rights. *See* Appellants' Brief at pp. 34-35. As Appellants acknowledge, this Court has already rejected this argument, and the *Kingsley* standard does not apply.

The *Kingsley* court held that to prove excessive force, pretrial detainees must establish the use of force was objectively unreasonable rather than that the officers were subjectively aware their use of force was unreasonable. *Kingsley*, 576 U.S. at 2472-73. This holding was clearly limited to excessive force cases brought by pretrial detainees, and the court declined to even rule on the standard for excessive force claims asserted by convicted prisoners. *Id*. at 2476. Appellants now ask this Court to apply this standard in cases involving Fourteenth Amendment rights to medical and mental health care, to protection from harm, and to be free of punishment.

Subsequent to the *Kingsley* ruling, this Court has continued to apply a subjective deliberate indifference standard to Fourteenth Amendment claims regarding failure to protect or denial of medical care to pretrial detainees. *See Cope v. Cogdill*, 3 F.4th 198, 207 n.7 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2573 (2022) (expressly rejecting application of the *Kingsley* standard in a jail suicide case); *Estate of Bonilla v. Orange County*, 982 F.3d 298, 305-06 (5th Cir. 2020). This Court has also distinguished the Ninth Circuit opinion that Appellants cite, *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). *See Alderson v. Concordia Par.*

*Corr. Facility*, 848 F.3d 415, 419 n.4 (5th Cir. 2017). This Court should continue to apply the well-established subjective deliberate indifference standard in deciding issues of qualified immunity rather than the objectively unreasonable standard set forth in *Kingsley*. Under the deliberate indifference standard, as explained in detail below, the summary judgment evidence conclusively established Appellees did not violate Worl's constitutional rights.

### 2. Appellees Did Not Act with Deliberate Indifference to Worl's Rights

Under the due process clause of the Fourteenth Amendment, pretrial detainees must be provided with reasonable medical care as well as to protection from known suicidal tendencies. *Estate of Bonilla v. Orange County*, 982 F.3d 298, 304-05 (5th Cir. 2020) (citing *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) and *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc)); *Rhyne v. Henderson County*, 973 F.2d 386, 391 (5th Cir. 1992). Government officials violate these Fourteenth Amendment rights when they act with deliberate indifference to a detainee's serious medical needs. *Estate of Bonilla,* 982 F.3d at 305. "To prove deliberate indifference, the Plaintiffs must show that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' that the defendants actually 'dr[e]w the inference,' and that the defendants 'disregard[ed] that risk by failing to take reasonable measures to abate it.' *Id*. (quoting *Hyatt v. Thomas*, 843 F.3d 172, 177, 179 (5th Cir. 2016)).

The deliberate indifference standard is extremely difficult to meet. *Id.* (citing *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001)); *see also Cope v. Cogdill*, 3 F.4th 198, 207 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 2573 (2022) (stating that deliberate indifference is a high bar which requires egregious conduct, although it does not require the plaintiffs to prove the official acted with the intent to cause harm) (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). Grossly negligent conduct in response to a substantial risk of serious harm is not enough to establish deliberate indifference. *Evans v. City of Dallas*, No. 3:16-CV-0561-L, 2017 U.S. Dist. LEXIS 35222 at *10 (N.D. Tex. Mar. 13, 2017) (citing *Hare v. City of Corinth*, 74 F.3d 633, 645-46 (5th Cir. 1996)). Nor is failing to eliminate a significant risk that the governmental official should have recognized, but did not, evidence of deliberate indifference. *Domino*, 239 F.3d at 756; *Nunez v. Deviney*, No. 4:06-CV-0579-BE, 2007 U.S. Dist. LEXIS 51683, *6-7 (N.D. Tex. July 17, 2007) (citing *Farmer v. Brennan*, 511 U.S. 825, 838 (1994) and *McClendon v. City of Columbia*, 305 F.3d 314, 326 n.8 (5th Cir. 2002)). An officer will also not lose the entitlement to qualified immunity due to a mistake in judgment. *Johnston v. City of Westworth Village*, No. 4:17-CV-279-A, 2017 U.S. Dist. LEXIS 104980, *7 (N.D. Tex. July 7, 2017). "In the context of inmate suicide, 'to defeat qualified immunity, the plaintiffs must establish that the officers . . . were aware of a substantial and significant risk that [the detainee] might kill [him]self, but effectively disregarded

it.'" *Cope v. Cogdill*, 3 F.4th at 207 (quoting *Jacobs v. West Feliciana Sheriff's Dep't,* 228 F.3d 388, 395 (5th Cir. 2000)); *see also Moore v. LaSalle Corrections, Inc*., No. 3:16-CV-01007, 2020 U.S. Dist. LEXIS 203193, *17 (W.D. La. Oct. 30, 2020) (quoting *Hare v. City of Corinth, Miss*., 74 F.3d 633, 650 (5th Cir. 1996) (en banc)) (stating that "[i]n the suicide context (which Plaintiffs invoke here), the relevant standard is 'not whether the [police] officer[] ''knew or should have known'' of the potential suicide risks, 'but whether [the officer] gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference.'").

Appellants allege Appellees ignored Worl's serious mental health issues and/or self-harm tendencies and were deliberately indifferent to those needs; failed to protect Worl; were aware of an excessive risk to Worl's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering and death and drew that inference; and their actions and/or inaction resulted in unconstitutional punishment of Worl. ROA.91. Contrary to these assertions, however, Appellants cannot show that either McGowen or Hall had actual knowledge Worl intended to commit suicide, that they were aware of facts from which an inference could be drawn that a substantial risk of serious harm to Worl existed, that either Appellee drew such an inference, or that Appellees disregarded that risk. *See Moore*, 2020 U.S. Dist. LEXIS 203193 at *17. There is no evidence that either Appellee knew Worl was suicidal or had any history of

mental illness or prior suicide attempts.[8]  As previously explained, Worl had a right to be protected from her *known* suicidal tendencies.  *See Estate of Bonilla*, 982 F.3d at 307.  There is no evidence Worl's tendencies were known to anyone, including Appellees, and there was nothing about Worl's actions that night that would suggest she would commit suicide.

Instead, the summary judgment evidence established neither McGowen nor Hall heard Worl make any statements to indicate she intended to harm herself, nor were they aware of Worl making such statements.  ROA.400, 419.  Worl did not engage in any suicidal behavior or otherwise display any signs that she had mental health issues, nor did Appellees believe she was suicidal or had mental health issues based on their observations, and Worl did not display any outward signs of injury or illness, with the exception of a burn to her hand that had occurred before her arrest.[9]  ROA. 400, 419.  Further, Officers Vegas and Hastings, who brought Worl to the Callahan County Jail, did not tell Appellees that Worl had exhibited any behavior

---

[8] As the district court correctly confirmed, "[t]here is no evidence Worl had attempted suicide shortly before being detained or that she presented herself as a high risk when being booked" nor was there any "evidence before the Court, beyond speculative evidence, to raise a genuine issue of material fact as to whether McGowen or Hall appreciated that Worl was a suicide risk or that the phone cord would likely be an instrument of suicide by Worl."  ROA.3355.

[9] Appellants may argue that Appellees' affidavits are self-serving and not credible, but they are substantiated by the video recordings, reports, and testimony of other witnesses, including Officers Vegas and Hastings.

which caused them to believe Worl was suicidal, had any mental health issues, or needed medical treatment.  ROA.400, 419.

In an attempt to show McGowen and Hall knew Worl was a suicide risk, Appellants' pleadings discuss various circumstances which they argue imputed knowledge to Appellees that Worl might harm herself.  None of them do.  In particular, they claim Worl's intoxication was a significant risk factor for suicide of which Appellees would have been aware.  ROA.60-61.  Contrary to this assertion, the fact of a detainee's intoxication does not indicate to an official that the detainee is a suicide risk.  *See Estate of Bonilla*, 982 F.3d at 305; *see also Belcher v. Oliver*, 898 F.2d 32, 35  (4th Cir. 1990) (stating "[t]he officers had no absolute duty to protect Belcher from harming himself merely because he was intoxicated, where they had no reason to believe that his intoxicated state would lead to harm which was self-inflicted"); *Johnston*, 2017 U.S. Dist. LEXIS 104980 at *12 (fact of detainee's drug addiction and that detainee appeared nervous and upset were not sufficient to show a significant suicide risk); *Moore*, 2020 U.S. Dist. LEXIS 203193 at *20-23 (detainee's intoxication was one of several facts that would not have given the arresting officer reason to believe the detainee intended to commit suicide).  Detainees present to jails in a state of intoxication regularly.  To suggest that intoxication imputes knowledge of suicide to jailers who have to deal with these individuals would place an unreasonable and unnecessary burden on those officers.

Appellants also contend Worl's behavior, described as "seriously distraught" and in an "agitated state," gave Appellees notice that Worl was a suicide risk. Appellants' Brief at p. 37. Additionally, with regard to Hall, Appellants' pleadings allege that she "was aware of Brenda initially, at her home, being physically violent and upset" and also that Hall described Worl as being "argumentative and combative." ROA.27. As for McGowen, Appellants cite to statements in her report describing Worl as being disruptive and uncooperative. ROA.35. Their pleadings also claim Appellees were aware of the fact Worl was arrested for family violence, had a history of prior family violence, was belligerent, would not calm down, and was refusing to answer any questions, arguing these facts made Worl a high risk for self-harm. ROA.60-61. Just as with intoxication, Worl's behavior and actions are not facts from which an inference could have been drawn that a substantial risk of serious harm to Worl existed. *See Branton v. City of Moss Point,* 261 Fed. App'x 659 (5th Cir. 2008); *Nunez,* 2007 U.S. Dist. LEXIS 51683 at *7; *Riggins v. City of Indianola*, 196 F. Supp. 3d 681, 696 (N.D. Miss. 2016) (citing *Chennault v. Mitchell,* 923 F. Supp. 2d 765, 783 (E.D. Va. 2013) and *Branton,* 261 Fed. App'x at 661)) (holding "neither potential drug use nor aggressive behavior, either alone or in combination, places an officer on notice of a substantial risk of suicide"); *see also Posey v. Southwestern Bell Tel. L.P.*, 430 F. Supp. 2d 616, 623 (N.D. Tex. 2006).

In *Branton*, the detainee was arrested for driving under the influence and intoxicated when he arrived at the police station. 261 Fed. App'x at 660. At the station, the detainee became violent, expressed that "he would lose his job, home, and everything," punched a hole in the wall and started a fight with the arresting officer." *Id*. The detainee subsequently stated that "his life was going to be over and that [the officer] might as well shoot him." *Id*. Officers placed the detainee alone in a cell for intoxicated and combative prisoners, and he was not checked for more than two hours, when they discovered he had hung himself with a bed sheet. *Id*. This Court held the defendant officers were entitled to qualified immunity and reversed the district court's denial of summary judgment on plaintiff's Fourteenth Amendment claims. *Id*. at 661. In reaching its decision, the *Branton* court found the evidence did not establish the officers had actual knowledge of a substantial risk of suicide, reasoning that "[p]eople who are violent to others often are not violent to themselves." *Id*.

Similarly, in the *Nunez* case, the court held that the defendant officers were entitled to summary judgment on the plaintiffs' Section 1983 claims based on the due process rights of a pretrial detainee to medical care, protection from suicidal tendencies and not to be punished. 2007 U.S. Dist. LEXIS 51683 at *5-8. The detainee in *Nunez* was arrested for public intoxication and became irritated and combative with officers at the jail. *Id*. at *2. As a result, they could not complete

the booking process and placed the detainee in a cell to allow him to calm down before completing booking. *Id.* They removed personal items from the detainee's pockets but did not remove his shoes or shoelaces prior to placing him in a cell. *Id.* No one monitored or checked on the detainee from 9:30 p.m. until 6:00 a.m., when an officer discovered the detainee committed suicide using his shoelaces. *Id.* The court held that, while the officers' conduct might have been grossly negligent, the evidence did not create a fact issue as to whether the officers acted with subjective deliberate indifference to a substantial risk of harm to the detainee. *Id.* at *9. In its analysis, the court noted that although the detainee was intoxicated and combative with the officers, this conduct did not alert the officers the detainee was a suicide risk. *Id.* at * 7 (citing *Posey*, 430 F. Supp. 2d at 623). The court also reasoned that, although the detainee fought with the officers, there was no evidence he indicated he was depressed or was contemplating suicide. *Id.* Finally, the court rejected the plaintiffs' argument that detainees are commonly depressed and suicidal, holding that would not constitute the "exceptional circumstance or obvious risk that would support an inference that defendants knew of a substantial risk of harm to Nunez." *Id.* at *8-9.

As courts have consistently and correctly held, Worl's intoxication and behavior was not evidence that she was suicidal, or that Appellees had knowledge that she was suicidal. Again, detainees regularly present to jails in a state of

intoxication and engage in argumentative, combative behavior.  This does not mean that they are, or should be treated as, suicide risks.

Appellants also attempt to paint a picture of Worl as an individual with a known history of mental illness[10] and further argue that Appellees should have treated Worl as someone facing a mental health crisis.  But as one court has explained, "'[p]olice officers are not psychiatrists'" and "cannot be expected to 'distinguish between a mental illness or handicap on one hand and drug-induced or simply obnoxious behavior on the other in a matter of seconds.'"  *Nuss v. City of Seven Points*, No. 3:18-CV-02192-X, 2020 U.S. Dist. LEXIS 197040, *7-8,  (N.D. Tex. Oct. 1, 2020) (citing *Barlow ex rel Moncebaiz v. Owes*, 400 F.Supp.2d 980, 984 (S.D. Tex. 2005)).  In *Nuss*, a defendant officer heard a detainee acting out and being difficult as well as responding to intake questions that he "'was messed up in the head.'"  *Id*. at *4-5.  The officer placed the detainee in a cell, where he committed suicide by hanging.  *Id*. at *2, 5-6.  The court found the detainee's behavior and statements were not sufficient for the officer to draw an inference that the detainee

---

[10] Although Appellants rely on a discussion between Officers Hastings, Piper and Billy Worl in which the officers inquired about Brenda's past mental health history, this exchange took place at the scene of the arrest and there is no evidence Appellees had any knowledge of these statements, nor do the statements reflect "that Brenda suffered from a history of mental disability" as Appellants contend, and in fact he denied any mental illness during the four years they had been together.  ROA.445 [Ex. 1-2 to Ex. D (COC00017) at 22:31:29 – 22:31.50)].  There is no evidence Appellees had any knowledge of any history of mental illness of Worl.  *Amici Curiae's* Brief reflects that they are not familiar with the facts of this case, and their arguments have no bearing on the factual or legal issues before the Court.

had a serious medical need.  *Id*. at *7.  In granting summary judgment for the officer on the basis of his qualified immunity, the court held the officer had no actual knowledge that a threat of serious harm existed.[11]  *Id*. at *10.

Likewise, in the present case, Appellees did not have actual knowledge that a threat of harm to Worl existed, and they could not have gained that knowledge based on Worl's behavior alone.  In fact, there is no evidence Worl had a mental illness, and in fact the evidence in the record is that she did not have a history of mental illness.  ROA.445 [Ex. 1-2 to Ex. D (COC00017) at 22:31:29 – 22:31.50)].

The facts in this case also do not support any claim that Appellees acted with deliberate indifference.  With regard to McGowen, when she heard Hall having difficulty getting Worl to answer the intake questions for booking, she went to assist her and also tried to obtain answers from Worl to the questions, which included a suicide screening form.[12]  ROA.399, 418.  After Worl continued to refuse to answer the questions, and prior to placing her in the visitation room, McGowen took Worl's coat, shoes and an eyeglass lens Worl had so that Worl could not use those items as

---

[11] At a later point, the officer did learn of an actual threat of harm the detainee made, and the court also held he did not act with deliberate indifference when he learned of that threat.  *Id*. at *8-10.

[12] Appellants maintain, without referencing any supporting evidence, that Appellees "enlisted the aid of the Officer-Defendants to coerce answers from Brenda by threatening prolonged detention." Brief of Appellants at p. 41.  While the officers did assist Appellees in their efforts to elicit Worl's cooperation so the booking process could be completed, there is no evidence Appellees asked the officers to threaten Worl.

devices to hurt herself or others.  ROA.418.  McGowen also checked on Worl just 14 minutes after placing her in the visitation room.[13]  ROA.399-400, 419.  As soon as McGowen discovered Worl had attempted suicide, she immediately called to Officer Hastings to have dispatch contact EMS, she unwrapped the cord from Worl's neck and moved her out from the visitation room, and she asked Hastings to begin CPR.  ROA.419.  The jail video from April 2, 2019, also reveals McGowen was running through the jail on several occasions after she found Worl hanging.  ROA.435 [Ex. 2-6 to Ex. C at 15:14:15, 15:15:03, 15:17:10].   This further demonstrates the urgency of her actions to try to help Worl rather than deliberate indifference.

As for Hall, to prepare for booking Worl into the jail, she conducted a check through the Texas Health and Human Services Commission CCQ system to determine if Worl had previously received state mental healthcare or had a known intellectual or developmental disability.  ROA.399. The CCQ information she obtained did not indicate Worl had any prior mental health issues.  ROA.399, 406.  Hall also attempted to complete the booking process for Worl, including obtaining answers from Worl to various questions on both a Medical Information Form and a

---

[13] Appellants complain about a lack of face-to-face checks of Worl, faulting McGowen because she checked on Worl only once and this check occurred after Worl was unconscious.  This argument ignores the fact of how quickly McGowen actually checked on Worl after placing her in the visitation room.

Screening Form for Suicide and Medical/Mental/Developmental Impairments. ROA.399, 418. Hall also checked on Worl approximately 12 minutes after she was placed in the visitation room and observed Worl sitting on a stool. ROA.400. Jail video corroborates this as it recorded Hall walking to and from the visitation room area at that time. ROA.400, 435 [Ex. 2-5 to Ex. C at 15:07:26, 15:07:35].[14] Additionally, when McGowen checked on Worl and discovered she had attempted suicide, Hall immediately paged EMS and called the Callahan County Sheriff to advise him of the situation. ROA.400.

Appellants argue that McGowen's actions in taking away Worl's personal items, including her coat, shoes and an eyeglass lens, is evidence that Appellees appreciated Worl was at risk for self-harm. That simply is not true. As McGowen explained in her deposition, she took these items because that was the protocol for all detainees, and it was done both for the protection of Worl as well as to ensure she did not have items on her that she could have used to harm others. ROA.1246, 1248 [depo. pp. 42, ll. 21 – 25; p. 50]. Former Clay County Sheriff Terry Joy also explained that McGowen was simply following County policy by taking these items from Worl for reasons of safety. ROA.1328 [depo. p. 18, l. 16 – p. 19, l. 17]. The

---

[14] Appellants dispute Hall actually made this observation. However, even assuming there is a fact issue on this point (which there is not) it is not a factual dispute that would preclude summary judgment. Regardless of whether Hall made this observation, McGowen went back to check on Worl only 14 minutes after her placement in the visitation room. ROA.399-400, 419. This was in far less time than the 30-minute checks the County jailers would have been required to perform had they known she was a suicide risk. ROA.432.

standard act of taking Worl's property does not create an issue of fact as to whether Appellees had actual knowledge Worl was suicidal.

Appellants also argue Appellees were deliberately indifferent because they failed to complete the booking process, which included a suicide screening form. A pretrial detainee's right to receive adequate medical care does not include the right to an intake screening. *Ybarra-Fuentes v. City of Rosenberg*, No. H-18-1824, 2018 U.S. Dist. LEXIS 195690, *18-19 (S.D. Tex. Nov. 16, 2018) (citing *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam)); *see also Nunez*, 2007 U.S. Dist. LEXIS 51683 at *5-9 (officers who failed to complete the booking process due to combative nature of pretrial detainee who later committed suicide did not act with subjective deliberate indifference); *Chipley v. Yazoo City*, No. 3:16cv901TSL-RHW, 2018 U.S. Dist. LEXIS 66639, *18-19 (S.D. Miss. Apr. 20, 2018) (holding that because the defendant booking officer did not know the detainee was a suicide risk, she did not act with deliberate indifference when she failed to complete the booking process of the intoxicated detainee and did not keep the detainee in the booking area to observe him until she had completed the process). Appellees were attempting to complete the booking process – they just were unable to do so because of Worl's lack of cooperation. Her lack of cooperation with the process does not

suggest the officers who were attempting to complete that process were deliberatively indifferent.[15]

Nor were Appellees required to continuously monitor Worl as Appellants allege. As support for this argument Appellants cite a concurring opinion from *Rhyne vs. Henderson County*, 973 F.2d 386, 395 (5th Cir. 1992) (Goldberg, J., concurring). As an initial matter, and as indicated in the language quoted in Appellants' Complaint, Judge Goldberg's concurrence specifically stated that continuous monitoring should occur "when jailers *know* a detainee is prone to committing suicide." *Id.* (emphasis added). Nevertheless, the caselaw rightfully confirms that continuous monitoring is not required. *See, e.g., Ybarra-Fuentes*, 2018 U.S. Dist. LEXIS 195690 at *18-19 (citing *Taylor v. Barkes,* 135 S. Ct. 2042, 2044 (2015) (per curiam); *Burns v. City of Galveston, Tex.*, 905 F.2d 100, 104 (5th Cir. 1990); *Gagne v. City of Galveston, Tex.*, 805 F.2d 558, 560 (5th Cir. 1986)); *see also Estate of Pollard v. Hood County*, No. 4:12-CV-163-Y, 2013 U.S. Dist. LEXIS 191877, *17-19 (N.D. Tex. Mar 14, 2013) (holding that when the defendant jailer was late in conducting several scheduled checks of a detainee, who had been placed

---

[15] Appellants cite *Farmer v. Brennan*, 511 U.S. 825, 843 n.8 (1994), to suggest Appellees can be liable if they refused to verify underlying facts that they strongly suspected to be true or declined to draw inferences of risk that they strongly suspected to exist. As the evidence conclusively establishes, however, Appellees had no reason to strongly suspect Worl was suicidal or had a mental illness. There is no fact issue as to whether Appellees had actual knowledge of a substantial risk to Worl because of suspicions they purportedly failed to confirm.

on a 15-minute suicide watch because he was a known suicide risk, the jailer's actions constituted at most negligence or oversight but not deliberate indifference).

In addition to caselaw, the minimum standards that apply to all County jails in Texas also do not require continuous monitoring of suicidal inmates. Instead, under these standards, jailers must observe inmates who are "known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior" at least every 30 minutes. 37 T.A.C. 275.1. In accordance with those standards, the Callahan County Jail Mental Disabilities/Suicide Prevention Plan, approved by the Texas Commission on Jail Standards on February 14, 2019, also required observation every 30 minutes of inmates known to be assaultive, suicidal, mentally ill or behaving bizarrely. ROA.428, 432.

The facts of the *Ybarra-Fuentes* case, which involve both a lack of suicide screening and no suicide watch of the detainee, support Appellees' entitlement to qualified immunity. In *Ybarra-Fuentes*, the detainee was arrested and detained for possession of a controlled substance. *Id.* at *2. The jail staff failed to screen the detainee, who had a history of suicidal thoughts, for mental illness, did not place him on suicide watch or continuously monitor him, and allowed him to wear his belt after placing him alone in a cell. *Id.* Later that night, the detainee hung himself using his belt. *Id.* The court granted the defendants' motion to dismiss because there were no allegations the detainee disclosed to jail staff that he was in withdrawal, was suicidal

or had prescriptions for drugs to treat mental illness, nor was there an allegation the defendants knew of any propensity the detainee had for self-harm. *Id*. at *17-18. The court further held the plaintiffs' allegations that the defendants did not screen the detainee for mental illness, place him on suicide watch and continuously monitor him, confiscate his belt, or give him medications did not evidence a disregard of any serious medical needs that could support a finding of deliberate indifference, thus the plaintiffs failed to sufficiently allege a Fourteenth Amendment claim. *Id*. at *18-19. Here, as in *Ybarra-Fuentes,* Appellees did not violate Worl's rights when they were unable to complete the suicide screening form and did not continuously monitor her.

Appellants also argue Appellees' failure to comply with Texas jail standards by not completing the suicide screening and placing Worl in a visitation room is evidence of deliberate indifference, citing to the Notice of Non-Compliance issued by the Texas Commission on Jail Standards to the Callahan County Jail following Worl's suicide. ROA.49-54. However, state laws and regulations do not create federal constitutional rights, and the failure to follow such mandates is not a constitutional violation. *See Danese v. Asman*, 875 F.2d 1239, 1245 n.5 (6th Cir. 1989), *cert. denied*, 494 U.S. 1027 (1990) (holding the violation of state mandates that required certain suicide prevention procedures, training and facilities did not cause the defendants to lose their qualified immunity); *see also Reyes v. Hale County*

*Jail*, No. 5:03-CV-180 C, 2003 U.S. Dist. LEXIS 28535, *4-5  (N.D. Tex. Sept. 16, 2003) (stating "the mere violation of a state law or regulation does not alone give rise to a constitutional violation cognizable under § 1983") (citing *Williams v. Treen*, 671 F.2d 892, 900 (5th Cir. 1982)).

Appellants also contend Appellees violated the Callahan County Jail mental disabilities/suicide prevention plan by not closely monitoring Worl after she refused to answer the screening questions.  ROA.71-72.  "Whether an officer violates a departmental regulation is immaterial to whether a constitutional violation occurred."  *Bernabe v. Rosenbaum*, No. 4:18-cv-00580-O, 2021 U.S. Dist. LEXIS 50706, *40 (N.D. Tex. Mar. 18, 2021) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1275 (5th Cir. 1992); *Rakestrau v. Neustrom*, No. 11-cv-1762, 2013 U.S. Dist. LEXIS 51182, 2013 WL 1452030, at *10 (W.D. La. Apr. 8, 2013)); *see also Mason v. Lafayette City-Parish Consul. Gov't,* 806 F.3d 268, 279  (5th Cir. 2015) (*citing Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 398 (5th Cir. 2000)) (holding that "[a] failure to follow official policy, by itself shows, at most, negligence and cannot support a finding of deliberate indifference.").   Therefore, Appellants' reliance on noncompliance with Texas jail standards or the suicide screening form to establish that Appellees violated Worl's constitutional rights is misplaced.

The fact that Appellees placed Worl in a room containing phones also does not constitute deliberate indifference.  This Court's recent opinion in *Cope v. Cogdill*

specifically addressed this issue.  3 F.4th at 210-11.  In *Cope*, the detainee was placed on suicide watch after he indicated on a screening form he was contemplating suicide, had attempted suicide two weeks prior, and had a history of mental illness. *Id*. at 202.  That same day, he had a medical emergency and was taken to the hospital. *Id*. at 202-03.  He returned to the jail the following day and attempted to commit suicide by hanging just 17 minutes after he was back at the jail.  *Id*. at 203.  Instead of obtaining emergency mental health treatment for the detainee, he remained at the jail in a cell with a telephone.  *Id*.  The plaintiffs claimed the defendant sheriff and jail administrator "were deliberately indifferent by housing [the detainee] in a cell 'with the means of committing suicide readily available to him in the form of a lengthy telephone cord.'"  *Id*. at 210.  This Court disagreed, reasoning there was no evidence any inmate had previously attempted suicide with a phone cord or that the defendants were aware of this danger.  *Id*.  In holding that placing a detainee in a cell with a phone cord did not violate a clearly established constitutional right, the court explained that "[t]he danger posed by the phone cord was not as obvious as the dangers posed by bedding, which is a well-documented risk that has been frequently used in suicide attempts."  *Id*. at 210-11; *see also Posey*, 430 F. Supp. 2d at 623 (in a case in which a pretrial detainee committed suicide using a phone cord, holding that "[a]lthough there was a corded telephone in Posey's cell, this alone is not a condition that poses a substantial risk of serious harm.").

Just as in *Cope*, there is no evidence any inmate or detainee ever attempted or committed suicide in the Callahan County Jail using a phone cord, and Appellees were not aware of any such attempts or of this danger. ROA.400, 419-420. Further, although in their Complaint Appellants point to a 2015 Texas Commission on Jail Standards memorandum addressing the potential risk of inmate suicide by use of a phone cord, Appellees had not received or reviewed this memorandum prior to Worl's suicide.[16] ROA.400, 420. More importantly, even if Appellees knew phone cords posed such a risk, they had no idea Worl was, in fact, a suicide risk and that by placing her in a room with a phone cord Worl would use it to take her own life. As in the *Cope* case, which differed factually from the present case in that the detainee in that case was a known suicide risk, placing Worl in a room with a phone cord did not constitute deliberate indifference.

Appellants also rely on McGowen's questioning of Worl about whether she had ever attempted suicide in the past, claiming that because Worl did not give an unequivocal denial this should have raised an immediate concern as to whether Worl was contemplating harming herself. Appellants further argue that it was not clear to either McGowen or Officer Hastings, who witnessed the exchange between

---

[16] The *Cope* court also specifically addressed this memorandum, finding the memorandum was insufficient to support an inference that the defendants had subjective knowledge of the risk posed by a lengthy phone cord and also that there was insufficient evidence that the defendants were exposed to the memorandum to create a fact issue as to their subjective knowledge of the risk posed by the phone cord. *Cope*, 3 F.4th at 210 n.11.

McGowen and Worl, why Worl presented her arms in response to McGowen's inquiry.  However, the witnesses did explain what this meant to them.  In his police report issued the day of Worl's death, Hastings explained: "Worl presented her arms to Dispatcher/Jailer Mcgowen [sic] in what I assume was an attempt to show scars or a lack thereof.  I personally did not see scars on Mrs. Worl's arms."  ROA.449-450.  In his deposition, Hastings stated Worl did not give any clarification as to why she was showing her arms, but he again confirmed he did not see anything on Worl's arms that indicated she had previously attempted suicide.  ROA.1289 [depo. p. 102, l. 1-4].

Appellants also allege that McGowen's deposition testimony regarding this exchange is contrary to her affidavit.  It is not.  In her affidavit, McGowen explained she took Worl's actions as an attempt to show she had not previously attempted suicide, because Worl did not have any injuries, scars or markings on her arms.  ROA.418-419.   McGowen's deposition testimony that she thought Worl had responded by shaking her arms due to her ongoing uncooperative behavior is consistent with these statements in her affidavit, as well as Worl's behavior that evening when responding to questions.  Neither this testimony nor the exchange between McGowen and Worl created a fact question as to McGowen's knowledge that Worl was suicidal.

In fact, this exchange involving Worl's display of her arms, which is corroborated by Officer Hastings, is not evidence of Appellees disregarding a risk, but instead of additional efforts to attempt to find out if any risk existed.  In fact, McGowen testified she asked Worl the question as a precaution.  ROA.1252 [depo. p. 66, l. 21 – p. 67, l. 9].  By asking Worl about past suicide attempts, McGowen was trying to determine if Worl was a suicide risk so she would be in a position to protect Worl if she did have a history of self-harm.  Worl's response did not give her any reason to believe Worl had attempted suicide in the past.  McGowen's further testimony that if Worl had stated she had previously attempted suicide, McGowen would not have placed her in the visitation room, and McGowen's acknowledgment of the presence of phone cords in the visitation room, does not provide an inference that McGowen acted with deliberate indifference.  McGowen's singular testimony that Worl could have committed suicide with a phone cord (or another ligature, such as a bra) does not mean she had actual knowledge it was substantially likely to occur.  This testimony is not evidence that Appellees were aware of a substantial and significant risk that Worl might kill herself.

Appellants also question whether CPR was immediately started on Worl when she was found hanging.  This is not in dispute.  Not only does McGowen confirm that Officers Hastings and Piper immediately began CPR, which continued until EMS arrived, but the body camera footage from both Hastings and Piper also shows

that Hastings initially started CPR but then alternated with Piper, and the CPR continued until the paramedics arrived. ROA.445 [Ex. 1-5 to Ex. D (COC00020) at 23:47:14; Ex. 1-12 to Ex. D (COC00027) at 23:46:01, 23:50:15 – 23:15:23].

Appellants also mischaracterize McGowen's testimony as to why she placed Worl in the visitation room. In her affidavit, McGowen explained the jail was full, and she placed Worl in that area until she could move other inmates around so she would have an empty cell for Worl. ROA.418. McGowen further advised Worl she would be in the visitation area until she could calm down. ROA.418. McGowen's affidavit is consistent with her deposition testimony that she told Worl she was placing her in visitation until she could find a spot for her. ROA.1252 [depo. p. 66, ll. 12-17]. McGowen also explained in her deposition that the visitation room is the place where Worl would have changed into inmate clothing as soon as she began to cooperate. ROA.1256 [depo p. 82, l. 11 – p. 84, l. 7].

Additionally, McGowen and Hall stated in their affidavits and their depositions that they were not able to place Worl in a cell with another inmate due to her behavior. ROA.399, 418, 1227 [depo. p. 68, ll. 3-15], 1246 [depo. p. 42, ll. 9-16].[17] And while Officer Piper admitted he was not with Worl when she became "disorderly" (ROA.1315 [depo p. 78, ll. 16-23]), Officer Hastings testified he would

---

[17] Callahan County Sheriff's Office Chief Deputy Chad Campbell also explained that there are circumstances in which an inmate cannot be placed in a cell with other inmates, including when they are combative or disruptive. ROA.427-428.

not have felt comfortable placing Worl in a cell with another inmate because she had a combative attitude and might have become violent toward the other person. ROA.1282 [depo. p. 76, l. 19 – p. 77, l. 9].[18]  The consensus of all of this testimony is that Worl was placed in visitation because of her behavior and refusal to cooperate with the booking process, and this was a temporary solution that was utilized because it was the only space available until they had an opportunity to move other inmates around and clear a cell.  It does not, as Appellants argue, support the idea that Appellees were punishing Worl for refusing to answer the mental health questions or that they intended to hold Worl there indefinitely until she did so, nor does it otherwise support that Appellees acted with deliberate indifference.

Appellants' description of the requirements of the jail suicide screening form are inaccurate as well.  They argue the form mandated a suicide watch when Worl refused to answer the screening questions.  The form actually provides that detainees who are "unable" to answer the questions should be placed on suicide watch. ROA.1202.  Here, Worl was able to answer the questions – she simply refused.[19]

---

[18] It is also undisputed Worl had been in a physical altercation with her husband prior to her arrest and she admitted to hitting him. ROA.445 [Ex. 1-9 to Ex. D (COC00024) at 22:40:25 – 22:41.20)]; *see also* ROA.449, 453.

[19] The Brief of Amici Curiae filed in this appeal includes citations to instructions for completing this form from the Texas Commission of Jail Standards website.  *See* Amici Curiae Brief at pp. 10-11.  These instructions are dated August of 2019, four months after Worl's death.  There is no evidence these instructions were in effect or even in existence in April of 2019, much less that Appellees had any knowledge of them.

Appellees admit the County suicide plan expressly states that inmates who refuse to answer screening questions are to be closely monitored.  ROA.431.  However, Appellees did closely monitor Worl.  ROA.1334-1335 [depo. p. 45, l. 19 – p. 46, l.1].  Appellees' close monitoring of Worl is confirmed by the undisputed fact they checked on her within 14 minutes – much sooner than would have been required by either the minimum jail standards or County policy, both of which required observation of suicidal inmates every 30 minutes.  *See* 37 T.A.C. 275.1; ROA.432.[20]

Appellants rely on *Converse v. City of Kemah*, 961 F.3d 771 (5th Cir. 2020) to suggest that Appellees acted with deliberate indifference because they allegedly did not provide sufficient measures to protect Worl from self-harm.  Their reliance on this case is misplaced.  As an initial matter, the *Converse* court found the defendant officers were not entitled to qualified immunity given their actual knowledge that the decedent inmate was at a substantial risk of committing suicide,[21] had been given a blanket they knew he should not have received and failed to remove the blanket from the inmate's cell.  *Converse*, 961 F.3d at 775-80.  Thus, the ruling in *Converse* was based on the death of an inmate who was unquestionably suicidal, a fact that

---

[20] As explained on pages 5-6, *supra*, the timing of the checks of Worl are confirmed by the jail videos.  The total time that lapsed from when Worl was placed in the visitation room until the check McGowen made when she discovered Worl attempted suicide was only 14 minutes. ROA.399-400, 419.  Appellants' argument that Appellees failed to check on Worl simply has no merit.

[21] All officers were aware the inmate had been arrested for threatening to jump off a bridge.  *Id*. at 773-74.

was known to the defendant officers.  The court expressly considered the actual knowledge the officers had that the detainee was suicidal in its discussion that it was insufficient for one officer to take some reasonable precautions.  *Id*. at 778-79. Further, as for the court's discussion of an argument by one of the defendants that he did not believe the detainee was serious about committing suicide, and explaining that in that case a jury could infer from the officer's removal of the detainee's shoes that he had the requisite knowledge the detainee was a serious suicide risk, it was important to the court's reasoning that this officer was present when the detainee was on the bridge threatening to jump and was the same officer who prepared the detainee's cell and gave him a blanket.  *Id*. at 779.

In contrast to the facts in *Converse*, Worl was not arrested for attempting to commit suicide, and did Appellees have any information that she was suicidal or that she had any history of mental illness or past suicide attempts.  The *Converse* decision does not support Appellants' contention that McGowen's removal of Worl's jacket, shoes and glasses lens, and Hall's knowledge of this, were meager steps "betraying their subjective appreciation of the danger" or that these actions create an inference that Appellees had knowledge Worl was suicidal.

Appellants also cite several cases, including *Converse*, for the proposition that deliberate indifference can be established by inferring the necessary subjective knowledge when the risk of harm was obvious.  However, these cases all involve

much different factual situations than here, with either an obvious risk based actual knowledge that a detainee had threatened suicide (*see Converse*, 961 F.3d at 773-74), or based on a wholly dissimilar factual scenario (*see Farmer v. Brennan*, 511 U.S. 825 (1994) (case involving a transsexual prisoner who was placed in the general population and subsequently beaten and raped by another inmate in the prisoner's cell); *Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020) (case involving a detainee who had violently bashed his head on the interior of a patrol car during his transport to jail but arresting and transport officers failed to seek medical care for the detainee or notify anyone at the jail)).  In contrast, Worl had not threatened suicide, nor does this case present circumstances under which knowledge can be inferred from the fact that the risk of harm to Worl was obvious.

Appellants also cite *Converse* and *Dyer*[22] as well as *Thompson v. Upshur County*, 245 F.3d 447 (5th Cir. 2001), and *Jacobs v. West Feliciana Sheriff's Dep't*, 228 F.3d 388 (5th Cir. 2000), to suggest that McGowen and Hall's actions constituted the same type of conduct addressed in these cases that was sufficient to state a claim for deliberate indifference to a known suicide risk.  However, a critical difference in the only two of these cases which involved inmate suicides, *Converse* and *Jacobs*,

---

[22] Appellants' only analysis of the *Dyer* decision is for that court's discussion of *Thompson*.  To the extent Appellants are relying on the conduct of the officers in *Dyer*, as previously explained, *Dyer* is not at all analogous to the present case.

is the fact that the defendant officers had actual knowledge of the suicide threats made by those inmates.[23]  As for *Thompson*, as Appellants have explained, that case involved a detainee who died from delirium tremens after jailers failed to seek medical assistance for him as his condition worsened over a time period greater than twelve hours.  245 F.3d at 452-54.  The inmate, whose blood alcohol level was over 0.3% at the time of his arrest, was hallucinating, speaking incoherently, and injuring himself.  *Id*. at 463-64.  Those facts are not comparable to the facts here, in which Worl had no apparent medical issues and had been at the jail only approximately 38 minutes (and in the visitation room for only approximately 14 minutes) when it was discovered she had attempted suicide.  Appellants' reliance on this case law to overcome Appellees' entitlement to qualified immunity is misplaced.

Appellants' discussion of *Cope v. Cogdill*, 3 F.4th 198 (5th Cir. 2021), also fails to support a denial of Appellees' qualified immunity.  One important distinction between the facts in this case and *Cope* is that the detainee in *Cope* was a known suicide risk.  Therefore, even if the Court were to determine that Appellees were aware that phone cords posed a potential risk in the abstract, they had no idea that Worl was, in fact, a suicide risk and that if placed in a room with a phone cord Worl would use it to take her own life.  The district court was correct in its analysis of

---

[23] As discussed above, the inmate in *Converse* had been arrested for threatening to jump off a bridge.  961 F.3d at 773-74.  Similarly, in *Jacobs*, the detainee had attempted suicide shortly before her arrest and the defendants were aware of this fact.  228 F.3d at 390.

*Cope* and in determining that there was a lack of evidence to "indicate that either Defendant McGowen or Hall were subjectively aware that Worl intended to harm herself at the time." ROA.3355.

In addressing *Cope*, Appellants rely on McGowen's acknowledgment that she was aware there were phones in the visitation room and that Worl could have committed suicide with a phone cord (or another ligature, such as a bra) if she had decided to do so. But McGowen's testimony does not explain or establish that she had knowledge Worl might be in danger due to the presence of the phone cords in the visitation area. McGowen also stated that prior to Worl, she was not aware of any inmate attempting suicide with a phone cord. ROA.400. Additionally, while Appellants cite to evidence of previous jail suicides in Texas using phone or other cords, as well as articles and other "pop culture" information about suicides involving phone cords and other cords in general, there is no evidence either Appellee McGowen or Hall was aware of any of this evidence.[24] More importantly, general knowledge that a person can use a cord to strangle themselves does not equate to specific knowledge that these Appellees knew Worl would do so that evening – especially in light of the fact she did not exhibit behavior that would

---

[24] The fact the Appellants had to resort to relying on this evidence indicates their lack of any evidence related to this case that creates a fact issue as to Appellees' actions here. A majority of the evidence Appellants included in their summary judgment appendix is not related to this case and has no relevance to the issues raised by Appellees' motion or their entitlement to qualified immunity. The district court was correct in sustaining Appellees' objections to this evidence.

suggest this would occur.  This evidence does not support a finding of deliberate indifference here.

Appellants also failed to provide any factual or legal support for their argument that Appellees' knowledge of the risk of phone cords should be inferred by the fact that the phones in the jail visitation room were two different lengths.  There is no evidence as to why these cords were different lengths, that one of the cords had been replaced at some point, or that Appellees were aware of a risk simply from this difference in the two phones.  And again, this knowledge does not in any way suggest Worl would use one of the phone cords to commit suicide that evening.

As for the 2015 Texas Commission on Jail Standards Commission memorandum that Appellants cite, as the *Cope* court stated regarding that same memo, there is no evidence in this case that Appellees were aware of the recommendations due to their employment.  *Cope*, 3 F.4th 198, 210 n.11 (stating that "just because information is *available* to a defendant does not mean she has been *exposed* to it.").  Here, while the Commission indicated it sent the memo out to Texas county sheriffs and jail administrators by email and posted it to its website, as Appellees have explained in their motion, they did not receive or review this memorandum prior to Worl's suicide.  ROA.400, 420.  Furthermore, the decisions in *Lombardo v. City of St. Louis*, 141 S. Ct. 2239 (2021) (per curiam), and *Timpa v. Dillard*, 20 F. 4th 1020 (5th Cir. 2021), have no application with regard to the

consideration of this memorandum as those cases addressed claims of excessive force involving restraint of detainees in a prone position and the existence of well-known police guidance against the use of that particular type of force. Moreover, the memorandum at issue here is, by its own terms not a mandate but a recommendation and is not comparable to the well-known police guidance involving excessive force through use of prone restraints. There is also a causal disconnect between any alleged knowledge of this memo and any knowledge that on that night Worl posed a suicide risk.

Appellants again rely on the *Lombardo* and *Timpa* decisions as well as *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018) (reversing summary judgment for defendant officers who violated department policy by using excessive force during the arrest of a detainee when they threw the detainee to the ground, tased him, choked him, punched and kicked him, pushed him into a face-down position, and handcuffed him behind his back, which caused the detainee to suffer a heart attack and die during the course of the arrest) and *Guiterrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998) (finding there was a fact issue as to whether the particular use of force at issue, hog-tying, had been banned by the department when an arrestee died as a result of being hog-tied in the back of the defendant officers' patrol car). They cite to these cases to suggest that actions of officers taken in violation of policy or training are relevant in analyzing the reasonableness of the officers' conduct. In addressing the

officers' use of force, the *Darden* court stated: "While we certainly do not suggest that the violation of police department policies is sufficient to make out a constitutional violation, we have found their existence and corresponding notice to officers relevant in analyzing the reasonableness of a particular use of force under the totality of the circumstances." Neither *Darden* nor *Guiterrez* (nor, as previously addressed, *Lombardo* or *Timpa*) bears any resemblance to the present case.

In sum, Worl arrived at the Callahan County Jail obviously intoxicated and combative, and she refused to cooperate with the efforts of both Hall and McGowen to obtain her answers to intake and suicide screening questions. ROA.399, 415, 418, 424-425, 449, 453-454. Faced with a full jail and no empty cell in which to place Worl to allow her an opportunity to calm down, McGowen placed Worl in the only space available, the visitation room, where she intended that Worl would remain temporarily until they could move other inmates around and clear a cell. ROA.418. Only 14 minutes after placing Worl in the visitation room, McGowen went to check on her and discovered Worl had committed suicide using a phone cord. ROA. 399-400, 419. Neither McGowen nor Hall had any information that would even suggest Worl was suicidal, and nothing Worl said or did would have led them to that conclusion. ROA.400, 419. Thus, the summary judgment evidence establishes Appellees were not aware of a substantial and significant risk that Worl might harm herself that they effectively disregarded.

Appellants' criticisms of Appellees center on their failure to complete the intake questions, lack of continuous monitoring of Worl, and placing of Worl in a room containing a phone cord. Appellants' arguments are based on review and criticism "through the lens of 20/20 hindsight," which is improper in a qualified immunity analysis. Even assuming Appellees' actions might create a fact issue on negligence, they clearly do not rise to the level of deliberate indifference.

### D.     The District Court's Summary Judgment Can Also Be Affirmed on the Grounds that the Existing Law Did Not Prevent the Actions of Appellees

Even if the Court were to find a fact issue as to whether Appellees' actions rise to the level of deliberate indifference, which Appellees deny, they were nevertheless entitled to summary judgment based on the existing law as of April 2, 2019. To determine this second element of the qualified immunity analysis, the Court must decide if Worl's constitutional rights that Appellants allege were violated were clearly established as of that date.

"For purposes of determining whether the right was clearly established, '[t]he relevant question . . . is . . . whether a reasonable officer could have believed [his or her conduct] to be lawful, in light of clearly established law and the information the . . . officers possessed.'" *Keller v. Fleming*, 952 F.3d 216, 225 (5th Cir. 2020) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). To overcome Appellees' entitlement to qualified immunity, therefore,

Appellants are required to provide the Court with a statute or case precedent that is sufficiently clear that every reasonable officer would have understood that what McGowen and Hall did violated the law. *Keller*, 952 F.3d at 225 (citing *Reichle v. Howards*, 566 U.S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012)); *see also Cope v. Cogdill*, 3 F.4th at 204-05 (5th Cir. July 2, 2021) (citing *Mullenix v. Luna*, 577 U.S. 7, 11, (2015) (per curiam)).  As recently confirmed by the Supreme Court, Appellants would only not be required to provide an analogous case if the facts involved extreme circumstances with an obvious constitutional violation.  *Cope*, 3 F.4th at 206 (citing *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (per curiam)).

Additionally, this Court has stated:

> When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that "*every* 'reasonable official would understand that what he is doing violated [the law].'"  To answer that question in the affirmative, we must be able to point to controlling authority – or a "robust 'consensus of persuasive authority'" – that defines the contours of the right in question with a high degree of particularity. . . . Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established.

*Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011), *cert. denied*, 567 U.S. 905 (2012) (citations omitted) (emphasis in original).  In *Morgan*, this Court stated the focus of determining clearly established law is on whether the defendant seeking qualified immunity had fair warning of the constitutional right at issue, noting that the existing cases must have placed the constitutional question beyond debate.  659

F.3d at 372.  "Therefore, unless existing precedent 'squarely governs' the conduct at issue, an official will be entitled to qualified immunity."  *Cope*, 3 F.4th 204 (citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (per curiam); *Mullenix*, 577 U.S. at 12)).

It was established long before the events at issue in the present lawsuit that pretrial detainees have a right to reasonable medical care as well as protection from harm.  *See Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). However, that general proposition does not inform the specific circumstances facing McGowen and Hall at the time Worl was detained at the Callahan County Jail.  To that end, there was no binding caselaw as of April 2, 2019, that would establish that a similarly situated jailer violated a constitutional right acting under similar circumstances as those which McGowen and Hall were confronted.

Further, to the extent Appellants argue that Worl had a right to an adequate suicide screening which Appellees violated by their inability to complete the booking process, despite the fact that Worl's suicidal tendencies were unknown to Appellees, the caselaw does not support this position.  *See Estate of Bonilla v. Orange County*, 982 F.3d 298, 307 (5th Cir. 2020) (holding no Fifth Circuit decision establishes the right to adequate suicide screening or suicide prevention protocols); *see also Ybarra-Fuentes v. City of Rosenberg*, No. H-18-1824, 2018 U.S. Dist. LEXIS 195690, *18-19 (S.D. Tex. Nov. 16, 2018).  Because Appellants cannot

prove that every reasonable jailer like McGowen and like Hall would have understood their actions violated the law, Appellees are entitled to qualified immunity and the Court should affirm the district court's summary judgment.

### E.    The District Court Properly Granted Summary Judgment in Favor of Appellees on Appellants' Bystander Liability Claim

The District Court properly granted summary judgment on Appellants' "bystander liability" claim against Appellees.  Courts apply this theory to hold individual defendants liable for the actions of another.  *See McDonald v. McClelland*, 779 Fed. App'x 222, 226 (5th Cir. July 11, 2019).  Appellants failed to establish any of the requirements to hold Appellees liable under this theory, nor did they create a fact issue as to any element of this claim.

"To prove bystander liability, the plaintiff must show 'the officer '(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.'"  *Id.* (quoting *Whitley v. Hanna*, 726 F.3d 631, 647 n.13 (5th Cir. 2013), *cert. denied*, 572 U.S. 1087 (2014)).  Because Appellees asserted their entitlement to qualified immunity, Appellants must also establish that, based on the clearly established law, Appellees were required to intervene under the circumstances.  *See id.* at *10-11 (citing *Whitley*, 726 F.3d at 647 n.13); *Deshotels v. Marshall*, 454 Fed. App'x 262, 269 (5th Cir. Nov. 10, 2011).  As previously addressed, Appellees did not violate Worl's constitutional rights, so their bystander claims fail on this basis alone.  *See*

*Timpa v. Dillard,* No. 3:16-CV-3089-N, 2020 U.S. Dist. LEXIS 118365, *32-33 (N.D. Tex. July 6, 2020) (*aff'd in part and rev'd in part on other grounds*, 20 F. 4th 1020 (2021)) (holding that when the court has determined there was no violation of a clearly established constitutional right, the right to have a bystander officer intervene is also not clearly established); *see also Curtis v. Peterson*, No. 5:20-CV-264-BQ, 2021 U.S. Dist. LEXIS 136719, *15 n.6 (N.D. Tex. May 28, 2021) (finding that when the plaintiff has not pleaded facts to show that the defendant's actions violated the Constitution, the plaintiff cannot state a claim based on the defendant's bystander liability).

Nor did Appellants present any evidence that either McGowen or Hall were present at the time another officer was violating Worl's rights, had a reasonable opportunity to prevent harm to Worl, and chose not to act.[25]  Further, the clearly established law at the time did not require either McGowen or Hall to intervene at any point when another officer was taking action involving Worl.  Accordingly, the Court should affirm the trial court's dismissal of  Appellants' Section 1983 claim based on bystander liability.

---

[25] Appellants suggest Appellees had three options to "intervene" to prevent harm to Worl, all of which are based on the unsupported assumption Appellees knew Worl was suicidal or believed she was mentally ill and likely to injure herself if not immediately restrained.  As previously established, this was not the case.

## II.    ISSUE NO. 2: THE DISTRICT COURT DID NOT ERR IN SUSTAINING APPELLEES' OBJECTIONS TO APPELLANTS' SUMMARY JUDGMENT EVIDENCE

### A.    Applicable Standard of Review

This Court reviews evidentiary rulings made in connection with summary judgment motions for abuse of discretion. *Keller v. Coastal Bend College*, 629 Fed. App'x 596, 598 (5th Cir. 2015) (citing *Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 401 (5th Cir. 2003); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1109 (5th Cir. 1991)). "[W]ith respect to expert testimony offered in the summary judgment context, the trial court has broad discretion to rule on the admissibility of the expert's evidence and its ruling must be sustained unless manifestly erroneous." *Cooper v. City of La Porte Police Dep't,* 608 Fed. App'x 195, 198 (5th Cir. 2015) (quoting *Hathaway v. Bazany*, 507 F.3d 312, 317 (5th Cir. 2007)).

### B.    The District Court Properly Ruled as to Appellants' Evidence

The district court did not err in sustaining the objections raised by Appellees to Exhibits A-1, A-3 – A-93, and Exhibit P contained in Appellants' summary judgment evidence. ROA.3356. The district court also expressly stated that even if it considered the exhibits to which Appellees objected, these "Exhibits do not raise a genuine issue of material fact as to deliberate indifference by Hall or McGowen." ROA.3356. The district court did not abuse its discretion in making its ruling. Nor

was the district court's ruling regarding the affidavits of Appellants' expert witnesses manifestly erroneous.  The Court should affirm both the rulings as to Appellees' objections as well as the granting of Appellants' summary judgment motion.

## **<u>CONCLUSION</u>**

The district court properly dismissed Appellants' claims against Appellees. Appellants failed to show a genuine issue of material fact exists as to Appellees' entitlement to qualified immunity.  They did not present evidence to suggest that the actions of Appellees rose to the level of deliberate indifference, nor did they provide the Court with a statute or case precedent to show it is sufficiently clear that every reasonable jailer like McGowen and like Hall would have understood their actions violated the Constitution.  Because the summary judgment evidence establishes Appellees did not violate Worl's constitutional rights, nor were they present for any violation of Worl's rights by another officer with a reasonable opportunity to prevent harm to Worl and chose not to act, their bystander claim also fails.  In short, for the reasons explained in their summary judgment motion, Appellees are entitled to judgment as a matter of law based on qualified immunity.  For these reasons, Appellees respectfully request this Court affirm the district court's granting of Appellees' motion for summary judgment and grant such other relief to which Appellees might be justly entitled.

Respectfully submitted,

By:    /s/Grant David Blaies
       GRANT D. BLAIES
       State Bar No. 00783669
       Email:  grantblaies@bhilaw.com

       JENNIFER HOLLAND LITKE
       State Bar No. 24002481
       Email:  jlitke@bhilaw.com

**BLAIES & HIGHTOWER, L.L.P.**
420 Throckmorton Street, Suite 1200
Fort Worth, Texas 76102
817-334-0800 (Telephone)
817-334-0574 (Facsimile)

ATTORNEYS FOR APPELLEES
DALENA HALL AND
CARI RENEA MCGOWEN

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2022, the foregoing document was served, via the Court's CM/ECF Document Filing System, https://ecf.ca5.uscourts.gov/, upon the following registered CM/ECF users:

| | |
|---|---|
| Bruce K. Thomas | ____ FACSIMILE |
| LAW OFFICE OF BRUCE K. THOMAS | ____ U.S. FIRST CLASS MAIL |
| 12900 Preston Road, Suite 590 | ____ HAND DELIVERY |
| Dallas, Texas 75230 | ____ CERTIFIED MAIL, RRR |
| bthomas@bthomaslaw.com | _X_ ELECTRONIC TRANSMISSION |

| | |
|---|---|
| T. Dean Malone | ____ FACSIMILE |
| Kristen Leigh Homyk | ____ U.S. FIRST CLASS MAIL |
| Brandie A. Moser | ____ HAND DELIVERY |
| LAW OFFICES OF DEAN MALONE, P.C. | ____ CERTIFIED MAIL, RRR |
| 900 Jackson Street, Suite 730 | _X_ ELECTRONIC TRANSMISSION |
| Dallas, Texas 75202 | |
| dean@deanmalone.com | |
| kristen.homyk@deanmalone.com | |
| brandie.moser@deanmalone.com | |

| | |
|---|---|
| Elizabeth Cumming | ____ FACSIMILE |
| Emily Washington | ____ U.S. FIRST CLASS MAIL |
| RODERICK & SOLANGE | ____ HAND DELIVERY |
| MacArthur Justice Center | ____ CERTIFIED MAIL, RRR |
| 4400 S. Carrollton Avenue | _X_ ELECTRONIC TRANSMISSION |
| New Orleans, Louisiana | |
| Elizabeth.cumming@ | |
|   Macarthurjustice.org | |
| Emily.washington@ | |
|   Macarthurjustice.org | |

 /s/Grant David Blaies
GRANT D. BLAIES
JENNIFER H. LITKE

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to FED. R. APP. P. 32(g), the undersigned certifies this brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f):

1.     this brief contains 12,995 words; and

2.     this document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Office Word 2016 in Times New Roman 14-point font.

THE     UNDERSIGNED     UNDERSTANDS     A     MATERIAL MISREPRESENTATION     IN     COMPLETING     THIS     CERTIFICATE,     OR CIRCUMVENTION  OF  THE  TYPE-VOLUME  LIMITS  in  FED. R. APP. P. 32(a)(7), MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.

Dated:  September 19, 2022

     /s/Grant David Blaies
     Grant D. Blaies

     ATTORNEYS FOR APPELLEES
     DALENA HALL AND
     CARI RENEA MCGOWEN